## COFFMAN v. UNITED STATES.
### No. 49223.

United States Court of Claims.
May 1, 1951.

Samuel M. Coombs, Jr., Jersey City, N. J., for the plaintiff. James D. Carpenter and Carpenter, Gilmour & Dwyer, Jersey City, were on the brief.

G. Murray Paddack, Washington, D. C., with whom was Asst. Atty. Gen. Holmes Balbridge, for the defendant. Newell A. Clapp and T. Hayward Brown, Washington, D. C., were on the brief.

MADDEN, Judge.

The defendant has made a motion to dismiss the plaintiff's petition, on the asserted

ground that the petition does not state a cause of action. We therefore state the substance of what the petition alleges in order to determine the merit of the defendant's motion.

The plaintiff was the inventor of what is known as the Coffman Internal Engine Starter and Power Generating Units and Igniting Means therefor. He took out numerous United States Patents on these devices on various dates from 1930 to 1942. In 1932 the plaintiff entered into a contract with Federal Laboratories, Inc., which contract expressly designated itself as a license and not an assignment of the ownership of the patents then held or to be later acquired. The contract authorized Federal to make, use, and vend devices embodying the patents, Federal to pay the plaintiff six percent of Federal's net selling price as the consideration for its privilege of using the patents.

Breeze Corporations, Inc., purchased all the shares of stock of Federal, and took over the manufacture of some of the devices in its own plant, while others continued to be manufactured in Federal's plant. Federal and Breeze manufactured units of the patented devices for the United States War and Navy Departments during the years 1937 through 1945, and, according to the terms of the plaintiff's contract with Federal, whereby the plaintiff should be paid six percent of Federal's net selling price, large sums of money would have been payable by Federal to the plaintiff. But Federal did not pay the plaintiff the amounts called for by the contract, and, after certain dates in February and March 1943, justified its refusal by pointing to notices served upon it and Breeze and the plaintiff by the Navy and War Departments, which notices were followed in December 1943 by "Royalty Adjustment Orders" of the two Departments, fixing the amounts of royalties which Federal might pay to the plaintiff at amounts less than the six percent provided in the plaintiff's contract with Federal.

The "Royalty Adjustment Orders" referred to above were made by the War and Navy Departments under the authority of the Royalty Adjustment Act, enacted in 1942, 56 Stat. 1013, 35 U.S.C.A. §§ 89–96. The purpose of the act is well stated in the opinion of Judge Goodrich in Timken-Detroit Axle Co. v. Alma Motor Co., 3 Cir., 1944, 144 F.2d 714. Section 1 of the act provided that whenever an invention should be manufactured, used, sold or otherwise disposed of for the United States, with license from the owner of the invention, which license provided for the payment to the owner of a royalty, if the head of the Government agency ordering the article believed the royalty to be unreasonable or excessive he should give written notice of that belief to the licensor and the licensee. Thereafter, after an opportunity for discussion, if requested, the head of the department should determine the rate or amount of royalty which he deemed to be fair and just, and the licensee was forbidden to pay the licensor any royalty in excess of the amount so fixed, and the licensor could not, in any legal action, recover any royalty in excess of the amount so fixed.

Section 2 of the act provided that any licensor aggrieved by any Royalty Adjustment Order might sue the United States in this Court, or in a District Court of the United States if the amount involved was such as to be within the concurrent jurisdiction of the District Court, and recover "such sum, if any, as, when added to the royalties fixed and specified in such [Royalty Adjustment] order, shall constitute fair and just compensation to the licensor for the manufacture, use, sale, or other disposition of the licensed invention for the United States, taking into account the conditions of wartime production". The last clause of the language just quoted perhaps expresses the reason for the act, that is, that a royalty reasonable for an anticipated small peacetime production of the invented device might, if the production were greatly increased by war orders of the Government, result in royalty payments unreasonably large and unduly burdensome to the public treasury, which would pay them directly, if the Government's contract with the licensee was on a cost basis, and indirectly, if it was on a lump sum or unit price basis.

Section 4 of the act provided that whenever a reduction in the rates or amounts of royalties was effected by a Royalty Adjustment Order, the reduction should inure to the benefit of the Government by way of a corresponding reduction in the contract price to be paid by the Government for the goods ordered by it.

The plaintiff sued Federal in the United States District Court for the Western District of Pennsylvania for the full amount of the six percent royalties provided for in the contract between the plaintiff and Federal. The theory of the suit was that the Royalty Adjustment Act was unconstitutional, and therefore the Royalty Adjustment Orders purporting to forbid Federal to pay the plaintiff in accordance with the contract were no justification for Federal's refusal to comply with the contract. Since the plaintiff's contention called into question the constitutionality of the Royalty Adjustment Act, the United States filed a motion to intervene in the suit, which motion was granted, pursuant to Act Aug. 24, 1937, 50 Stat. 751, 28 U.S.C. § 2403. The United States Court of Appeals for the Third Circuit affirmed the decision of the District Court. Coffman v. Federal Laboratories, 3 Cir., 171 F.2d 94, certiorari denied, 336 U.S. 913, 69 S.Ct. 603, 93 L.Ed. 1076. The United States was also a party to the proceeding in the Court of Appeals, being designated as an intervenor. The District Court held that the Royalty Adjustment Act was constitutional; that the Royalty Adjustment Orders therefore justified Federal in refusing to pay the plaintiff the royalties stipulated in the contract; and that the plaintiff's remedy, if the royalties permitted to be paid to it by the Royalty Adjustment Orders did not justly compensate it for the use of its invention, was by suit in this Court, pursuant to Section 2 of the Royalty Adjustment Act.

The plaintiff, his suit in the District Court having been dismissed, and that dismissal having been affirmed by the Court of Appeals, and both courts having said that the plaintiff's remedy, if he had not been justly compensated, was to be had in this Court, filed the petition now under consideration. Under separately numbered claims the plaintiff sets forth different theories of recovery. His first claim, the legal basis of which is stated in paragraph 16 of his petition, seems to assert that the Royalty Adjustment Orders were in violation of the due process clause of the Fifth Amendment of the Constitution in depriving him of the right to collect all the royalties stipulated in his contract with Federal. This claim would seem to be a repetition of the contention made by him in the District Court and the Court of Appeals, and therefore foreclosed by the decision of those courts. Besides, if the contention were valid and not foreclosed as *res adjudicata,* it would seem to follow that the suit should be against Federal and not the United States, and this Court would not have jurisdiction.

The plaintiff's second claim, stated in paragraphs 18 and 19 of his petition, states that the Royalty Adjustment Orders made by the War and Navy Departments did not provide fair and just compensation to the plaintiff, and that he sues for the additional amount necessary to constitute such just compensation. He says that the provision of Section 2 of the Royalty Adjustment Act which requires us to "taking into account the conditions of wartime production" is unconstitutional and void, and he asks for just compensation, as provided in said Section 2, "after striking therefrom the void provisions". As we have said, the "conditions of wartime production" clause expresses the *raison d'etre* of the Royalty Adjustment Act; a determination that this clause was void would so undermine the act as to make it useless, and therefore unconstitutional *in toto;* and hence we regard this claim, like the plaintiff's first claim, as already adjudicated by the former litigation. The contention that the "conditions of wartime production" clause was unconstitutional, and made the act unconstitutional, was made and specifically discussed and denied in the opinion of the Court of Appeals. 171 F.2d 94, 99.

The plaintiff's third claim, in paragraphs 21 and 22 of his petition, asserts that "taking into account the conditions of wartime production" the royalties permitted

to be paid by the Royalty Adjustment Orders did not constitute fair and just compensation to the plaintiff. This claim follows the scheme of the statute and has not been adjudicated. We therefore have jurisdiction of it.

We put aside, for the moment, the plaintiff's fourth claim, which involves a different problem, not covered by the Royalty Adjustment Act.

The only reason urged by the Government in support of its motion to dismiss the plaintiff's petition is that the agreement made between the plaintiff and Federal Laboratories, Inc., Exhibit A to the plaintiff's petition, is, the Government asserts, an assignment of the plaintiff's patents, and not a license to use them, and that the ownership of the patents is, therefore, in Federal Laboratories and not in the plaintiff. The Government suggests that Federal, or other persons claiming under it, not parties to this suit and not bound by the judgment herein, might later make claims against the Government.

We think it is unnecessary to decide whether the agreement between the plaintiff and Federal is a license or an assignment of the patents. It was couched in the language of a license, and, as we have said, the parties in the fifth paragraph of the agreement expressly provided that "in no event or by process of law, shall this license agreement be construed to be an assignment to said Licensee of any of said patents or applications * * *." We recognize, of course, that parties cannot, by agreeing upon an inaccurate label for a transaction, attach legal consequences to it which would attach to such a transaction if the label were accurate. Whether the agreement was a license or an assignment, it did not divest the plaintiff of all his interests in the patents. There was the right to forfeit Federal's rights under the agreement if it did not exploit the patents with diligence, or if the returns to the plaintiff were less than $5,000 per year, or if Federal became bankrupt. There was the right that Federal should not manufacture or sell competing devices. There was the right to select patent attorneys, to be paid by Federal, to prepare patent applications, and the right to be represented by attorneys selected by the plaintiff in infringement suits. And there was the important right to be paid six percent of the net selling price of the devices manufactured by Federal and covered by the patents.

In this, as in other situations involving land or chattel property, it is necessary to know the purpose for which ownership or lack of it is thought to be important before the question of ownership can be decided. One may be the "owner" for one legal purpose, but not for another, where the interests in the property are divided between two persons, as in the cases of landlord and tenant, and bailor and bailee. Here there was a division of the interests in these patents between the plaintiff and Federal, each having important and valuable rights in them.

The Royalty Adjustment Act, in its Section 1, is made applicable to situations in which things are manufactured for the United States "with license from the owner thereof or anyone having the right to grant licenses thereunder, and such license includes provisions for the payment of royalties the rates or amounts of which are believed to be unreasonable or excessive * * *." In the instant case, Federal had obtained the privilege of manufacturing the patented articles by entering into the agreement with the plaintiff. The agreement was, therefore, Federal's permission, or "license," as the man in the street might put it, to manufacture things on which the plaintiff had, up to the time of the agreement, the monopoly of his patents. The permission, or "license" unquestionably "included provisions for the payment of royalties." The situation was one which clearly called for the remedial provisions of the Royalty Adjustment Act, if the United States was to be relieved from the burden of paying, for its munitions, unreasonable prices fixed by others on the expectation of the production of only a few units.

■ We have no reason to suppose that Congress, in the Royalty Adjustment Act, meant to use the word "license" in some narrow, technical sense, and thereby fail to cover situations which fell squarely within the purpose and intent of the stat-

ute. We conclude, therefore, that the agreement between the plaintiff and Federal was a license within the meaning of the Royalty Adjustment Act, whether or not it was a license for some other purpose of the law of patents. We think that the Government, by arguing that the plaintiff has no right to seek relief in this Court under the Royalty Adjustment Act, because the plaintiff was not a licensor and Federal was not a licensee within the meaning of that act, is, in effect, saying that the plaintiff should have won its suit for the full amount of the agreed royalties in the District Court. If we are right in this analysis, the Government, which intervened in that Court and in the Court of Appeals to defend the constitutionality of the act, should have at least suggested to those courts that it was wholly unnecessary to consider the constitutional question since the act was not applicable to the situation before the Court, and the Royalty Readjustment Orders of the Secretaries of War and the Navy which Federal was using as a shield in that case were a nullity, because the Royalty Adjustment Act under which the Orders purported to be issued was not applicable.

We consider now the fourth claim of the petition. This claim is made pursuant to 28 U.S.C. § 1498, the present version of the Act of 1910, 36 Stat. 851, as amended in 1918, 40 Stat. 705, 35 U.S.C.A. § 68. That act permits the owner of a patent, when the patented invention is manufactured by or for the United States, to sue the United States in this Court for reasonable and entire compensation for the use of his patent. The plaintiff's fourth claim alleges that Bendix Aviation Corporation and several other companies have, pursuant to orders from the United States, manufactured for the United States the devices covered by the plaintiff's patents, the same patents included in the plaintiff's agreement with Federal. We now consider the Government's motion to dismiss as applied to the plaintiff's fourth claim.

A reading of the agreement between the plaintiff and Federal does not tell us which of them would be entitled to money recovered under the fourth claim. As we have said, the agreement transferred important interests in the patents to Federal, but left important interests in the plaintiff. The plaintiff was to get his compensation in the shape of royalties to be paid by Federal, and Federal was to diligently exploit the patents, under pain of forfeiture, so that the plaintiff would receive adequate compensation. But the agreement does not clearly state which party should get any money recovered from an infringer. In its seventh section, it provides that Federal shall, at its own expense, diligently prosecute suits for the infringement of the patents, and in the third paragraph of its sixth section it provides that the plaintiff may select attorneys, to be paid by him, to participate with Federal's attorneys in such suits. But it does not expressly determine which of the parties should receive the damages recovered for infringement, and it does not mention claims against the United States under 28 U.S.C.A. § 1498.

Since the question of the extent of the plaintiff's interest in the fourth claim can only be resolved after evidence and argument, and since Federal Laboratories, Inc., probably has, and Breeze Corporations, Inc., may have, an interest in that claim, they should be made parties to this suit, as to the fourth claim of the petition, and the necessary steps to make them parties should be taken immediately, pursuant to 58 Stat. 663, 41 U.S.C.A. § 114 and Rule 39(c) of this Court, 28 U.S.C.A. Proceedings under the third claim should go forward promptly, as there is no reason to suppose that these additional parties have any interest in that claim.

The Government's motion to dismiss the plaintiff's petition is granted as to the first and second claims of the petition, and denied as to the third and fourth claims.

It is so ordered.